## Buckley *versus* Garrett *et al.*

*Transfer of insured property, when a forfeiture of policy.— Waiver of forfeiture by insurer.*

1. A transfer by one tenant in common to his co-tenant, or from one partner to another, is within the prohibition of a policy of insurance which declares that alienation by sale or otherwise, shall forfeit the policy.

2. But a provision in a policy of insurance that it should become void upon a sale or transfer of property insured, unless it was also transferred to the purchaser and the transfer accepted by the president or secretary of the company within twenty days after the sale or transfer, or before a fire, the assign-

[Buckley *v.* Garrett *et al.*]

ment to be endorsed on or annexed to the policy; does not apply to a case where the assured has parted with his interest in the policy by an assignment approved by the company: and the policy is not avoided by such assignment.

3. Where the policy was to continue so long as the yearly payments stipulated therein were made, and after its assignment, approved by the insurance company, one of the partners of the firm insured, sold and transferred his interest in the property insured to his copartner, who continued for several years thereafter to make the yearly payments required by the policy, to the treasurer, the authorized agent to receive them, but no notice of the sale of the partnership interest was regularly given, nor any transfer of the policy executed to the purchaser, it was held not thereby necessarily void: but that the facts were evidence, to be submitted to the jury upon the question whether the state of the policy was known to the company: if so, their receipt of the annual premiums four years after the assignment, tended to show an acquiescence in the alienation, a waiver of the forfeiture, and consequently, an estoppel.

4. Hence it was error to instruct the jury that, the transfer by one of the partners to the other having made the policy void, the payment of the annual instalments to the treasurer and acceptance by him would not render it valid, and that under the evidence the plaintiff was not entitled to recover.

ERROR to the Common Pleas of *Chester county.*

This was an attachment execution brought by Edward P. Collier to the use of Carver Schofield *et al.,* judgment-creditors of James Buckley, attaching in the hands of The Chester County Mutual Insurance Company, $750, with interest from March 19th 1861, claimed to be due said Buckley.

The facts were these:—On the 25th day of September 1846, the Mutual Fire Insurance Company of Chester County issued to James Buckley and James Schofield, copartners, a policy of insurance, numbered 4293, for $3050, upon a stone woollen-factory and outbuildings, in Sadsbury township, Chester county, owned and occupied by them.

On the 29th day of September, 1846, Buckley & Schofield assigned the policy of insurance to Farnum, Newhall & Co. as collateral security for the payment of money loaned by them on the premises therein insured, which assignment was approved by the company, March 1st 1847.

On the 16th day of March 1850, Farnum, Newhall & Co. assigned the policy to Esther Painter as collateral security for the payment of money loaned by her on the premises therein insured; which was approved by the company, April 2d 1850.

On the 31st day of March 1855, Abram W. Baily, executor of Esther Painter, assigned the policy to Caleb Hoopes as collateral security for the payment of money loaned by him on the premises therein insured; which was approved by the company, April 15th 1855.

The premiums upon the policy were paid regularly by Buckley & Schofield, from September 1846 until March 1854, when they dissolved partnership, Schofield going out, and conveying to James Buckley, the remaining partner, all his interest in the

insured premises. After this the premiums were annually paid by James Buckley, up to September 1861.

On the 19th day of March 1861, a fire occurred on the insured premises, involving a loss upon this policy of $1500.

Caleb Hoopes, the holder of the policy at the time of the fire, demanded this loss of the company, but they refused to pay to him more than the one half thereof, to wit, $750; alleging that the other half was forfeited by the sale of Schofield's interest in the insured premises in 1854, to Buckley, without a transfer by Schofield to Buckley of the policy, with the approval of the company, as they claimed was required by the 11th clause of the by-laws attached to the policy, viz.:

"11. Any person selling or otherwise transferring the property (or any part thereof) insured in this company, his policy shall be void (so far as relates to the part so sold or transferred), unless the said policy be also transferred to the purchaser thereof, and the said transfer accepted by the president or secretary, within twenty days after the said sale or transfer shall be fully concluded, or before a fire happens to any part of the premises so sold or transferred; such assignment to be endorsed on or annexed to such policy or contract of insurance, agreeably to the 7th section of the act incorporating this company."

On the 12th of July 1861, Caleb Hoopes received from the insurance company $750, without prejudice as to any claim for the balance of the loss.

Shortly afterwards Hoopes obtained satisfaction of the balance of his claim for which he held the policy as a collateral, by a sale of James Buckley's land, and on the 2d of August 1861 this attachment execution was issued, all remaining interest in the policy having reverted to James Buckley, the defendant in the attachment.

It was in evidence that the treasurer of the insurance company, in charge of the office at Coatesville, had knowledge of the dissolution of the copartnership between Buckley and Schofield, and of the sale by the latter to Buckley of his interest in the insured premises, shortly after the sale took place, in 1854; that he continued annually for some years, as the agent of the company, to receive from James Buckley the whole assessed premium upon the full amount insured by the policy. The learned court below, upon the trial of the cause, charged the jury that the omission of Buckley (when he purchased Schofield's interest in the insured premises) to obtain from Schofield a transfer of the ·policy of insurance, with the approval of the company, made the policy void under the 11th clause of the by-laws, and that no recovery could be had by the plaintiff, that the acceptance by the treasurer of the company of the premiums, with a prior knowledge of the sale of the insured premises from Schofield to Buckley, was not

[Buckley v. Garrett et al.]

such a notice to the company as required by the condition of the policy, and therefore did not relieve its forfeiture; which was the error assigned here by the plaintiff, after a verdict and judgment for defendant.

*John H. Brinton* and *John M. Arundel*, for plaintiffs in error, cited and relied on The Traders' Insurance Company v. Roberts, 9 Wend. 404; Titlow v. Kingston Insurance Company, 7 Barb. 370; Allen v. Insurance Company, 19 Id. 442, 1 Seld. 405; Taylor v. The Merchants' Insurance Company, 9 How. 390; Clark v. New England Insurance Company, 6 Cush. 342; Buckbee v. United States Insurance Company, 18 Barb. 541; Etna Fire Insurance Company v. Tyler, 16 Wend. 385; Francis v. The Ocean Insurance Company, 6 Cow. 304.

*Wayne McVeagh*, for defendants in error, relied on Finley v. The Lycoming Insurance Company, 6 Casey 311; Tillon v. The Kingston Mutual Insurance Company, 1 Seld. 405; The Inland Insurance Company v. Stauffer, 9 Casey 403; Trask v. The Insurance Company, 5 Id. 200.

The opinion of the court was delivered, February 1st 1864, by
AGNEW, J.—Policy No. 4293, dated September 25th 1846, was issued by the Mutual Fire Insurance Company of Chester County to Buckley & Schofield (the name of the firm) and their assigns, in the sum of $3050, they paying a premium of $220.75 when needed to pay losses, and the annual sum of $13.24. The policy was perpetual, provided the payments were made in conformity to the terms of the policy. The property insured was conveyed to James Buckley and James Schofield, March 30th 1846 (trading under the firm of Buckley & Schofield), but to hold as tenants in common. On the 29th of September 1846, four days after its date, the policy was assigned by Buckley & Schofield to Farnum, Newhall & Co., and afterwards approved by the secretary of the company. Farnum, Newhall & Co. assigned to Esther Painter on the 16th of March 1850, with the approval of the secretary. On the 31st of March 1855, the executor of Esther Painter assigned the policy to Caleb Hoopes. This was also approved by the company.

On the 27th of March 1854, Buckley & Schofield by writing dissolved their partnership, and Schofield transferred his interest in the property insured to Buckley. This paper was recorded on the 9th of January 1856. From 1854 until 1861 Buckley continued to pay the annual interest required by the policy. These payments were made to Henry G. Thomas, the treasurer of the company. He had been treasurer for nine years, and during the same time and before, a manager of the company.

[Buckley *v.* Garrett *et al.*]

He testifies it was his duty to take care of the books, and receive the money and give receipts; receive from the receivers and pay orders; to receive application for changes, and that every manager is a surveyor; that by the by-laws notice of a sale comes in the shape of a transfer of the policy, and then the notice after it is written and signed. That he has no control over the transfer till given and approved. The secretary is the proper person to approve the transfer. The secretary is in the same room with him. Speaking of the transfer from Schofield to Buckley, he says: " I mentioned to Buckley once or twice he ought to have the policy altered, transferred by the firm to his own name several years ago. I knew of the dissolution by common report, not otherwise. I think we talked about it when I spoke of changing the policy. I can recollect no more than when he was paying the premium, I thought his policy in danger from not having it transferred; can't say if this was four, five, or six years ago. Was before the fire—probably three or four years before. Paid the premium up to the time of the fire; I did not object to receiving it; it went into the treasury. I think I told him twice about his policy; should be transferred. Don't know when the sale from Schofield to Buckley was; know nothing but the dissolution—likely knew of the transfer from report; knew from him or others some firm dissolved; perhaps, saw it in the paper. Buckley renewed after the firm dissolved, and I, therefore, knowing how the matter stood, advised a transfer." Other witnesses testify to the death of Schofield in 1858, his burial, and that many persons were at his funeral; that he left the place where he had been doing business the same spring after the dissolution of the firm. The dissolution was published in the newspaper. The assignment of the policy had been to secure money lent on the security of the mortgaged premises. In July 1861, the company paid Caleb Hoopes, the last assignee, one-half of the loss without prejudice to the claim for the remainder. Shortly after this, the debt for which Hoopes held the policy as security was paid, by which the equitable title to the policy revested in Buckley, and this is the subject of the attachment in execution issued on the 2d of August 1861.

Upon this state of facts the court below charged the jury, that the transfer by Schofield to Buckley in 1854 made the policy void; that the payment of the annual instalments to the treasurer and acceptance by him will not render it valid—the acceptance of the money would not render that good which was already void,—and concluded by saying, " We instruct you that this policy is void, and that the plaintiffs are not entitled to recover under the evidence;" thus, not only holding that the policy was wholly void according to the by-laws, and the forfeiture incapable of being waived, but withdrawing from the jury all the evidence tending to show a waiver and an estoppel.

[Buckley v. Garrett et al.]

In this we think the learned judge went too far, both in his construction of the by-law and his estimate of the evidence of an estoppel.

Since the case of Finley and The Lycoming County Mutual Insurance Company, 6 Casey 311, it is not to be doubted that a transfer of a tenant in common to his co-tenant, or from one partner to another, is within the prohibition of a policy which declares that alienation by sale or otherwise shall forfeit the policy.

Nor can it be now disputed, since the decision in the case of the State Mutual Insurance Company v. Roberts, 7 Casey 438, that an assignee of a policy assigned to secure a mortgage on the insured premises is in no better plight than the assignor. The doctrine of the cases of The Traders' Insurance Company v. Roberts, 7 Wend. 404, Gillon v. The Keystone Insurance Company, 1 Seld. 405, and others following in their wake, is shown by Justice Strong very clearly to be fallacious in principle and controverted in authority. The assignee of a policy, even though as mortgagee holding an insurable interest himself in the premises, is therefore subject to all the conditions in the policy, and takes the instrument with the risks growing out of the conduct of the assured in violation of his contract. The assent of the underwriters is not therefore operative to produce a new contract or vary the terms of the policy, but only to preserve the policy from forfeiture by the instrumentality of this required assent. This case, therefore, must depend on the construction to be given to the clause in this policy, which it is alleged was violated by the alienation of Schofield. Of course, if it be an absolute prohibition, the judge below was right. But while we hold to the necessary doctrine of protection to these companies, by allowing them to hedge themselves around by guards against fraud, carelessness, want of interest, &c., we must hold them to the salutary rule of construction, that as the language of the conditions is theirs, and they can therefore provide for every proper case, the construction of the by-law or condition is to be most favourable to the assured: Western Insurance Company v. Copper, 8 Casey 351—Per Strong, J.

The 11th by-law is in these words: "Any person selling or otherwise transferring the property (or any part thereof) insured in this company, his policy shall be void (so far as relates to the part so sold or transferred), unless the said policy be also transferred to the purchaser thereof, and the said transfer accepted by the president or secretary within twenty days after the said sale or transfer shall be fully concluded, or before a fire happens to any part of the premises so sold or transferred, such assignment to be endorsed on or annexed to such policy or contract

of insurance, agreeably to the 7th section of the act incorporating this company."

Is this rule to be construed to apply to a case where the assured had parted with his interest in the policy by an assignment approved by the company? Looking at the nature and terms of the policy, the language of the by-law, and the policy of the state, we think it should not. By the terms of the policy it was to endure as long as the assured made his payments according to its terms. It expressly provided for the power of assignment, for it is made also to assigns. By the assignment, the assignee stood in the room of the assured as to the benefit secured by the instrument. The assured could no longer control the policy. He might affect it by acts or omissions within the conditions, but he could neither claim nor receive the benefit, and could not control the possession. It is clear, therefore, that in case of alienation of the premises to a third party, the alienee would not be entitled to the benefit of the policy, and could not call for its assignment, while the assured had by the assignment of the policy to another, with the assent of the company, put it out of his power to transfer it to the purchaser of the insured premises. Add to this the policy of the law, which forbids unnecessary restrictions upon alienation; for the consequence of the assignment is to fetter alienation so long as the policy endures, and it might endure for ever, or so long as the payments are kept up; and not to keep them up is to lose the security, and all payments theretofore made.

It was in the power of the company to have said that every alienation, unless assented to by the company, should be void, and thus to have declared a general rule, which would put both the assignee of the policy and the assured upon their guard. But when they simply declared it should be void, unless transferred to the purchaser, they are to be understood in favour of the holder of the policy to mean that in all cases where the policy can be assigned to the purchaser, it is to be done as required in the rule. Having themselves obscured the by-law by the use of language that seems to look only to cases where the assured has it in his power to assign the policy, they are to be held to that interpretation, especially where it accords with the policy of law discouraging restraints upon alienation, and where by the terms of the policy it is assignable, and they have encouraged the assignee to rely upon it as a security by reason of their approval. If they will exact severer terms, let them speak out plainly, and then we must hold even the assignee to the contract.

It may be answered that the sentence (for the rule is all in one breath) may be divided, the first clause standing as an absolute forfeiture, and the second as an exception to which the

assured may retreat in that particular case, and therefore it is his folly to cut himself off from it by an assignment of the policy in advance of his alienation of the estate. This interpretation may be given to the rule, but not necessarily must; while we prefer construing a rule of equivocal import, capable of misleading, in that manner which, while it saves a forfeiture, and best comports with the main interest to be served by the policy, also accords with the continuing character of the writing, the public policy, and good faith to the assignee. Thus, while we do not return to the doctrine of The Traders' Insurance Company *v.* Roberts, and its cognates, we take the reasons which supported them as a partial ground to induce us to interpret this clause most favourably to the mortgagee holding the policy.

We think also that there was evidence to have been submitted to the jury of knowledge on part of the company, and estoppel in consequence of successive receipts of the premium on the policy. In saying this, it is not to be understood that there was evidence of notice as a contract requisite. Notice by the terms of the writing was an act to be performed in a certain mode, and to be given to the secretary or president. There was none such. But a knowledge of the fact, with a continuing receipt of the premiums, is a different thing, and is a fact to be found by the jury, if there was evidence to go to them.

How was this? The policy continued as long as the payments should be made upon it. Thomas, the treasurer, was the authorized officer to receive those payments, and therefore bound to see that his receipts conformed to the rights of the parties. Being the only person to whom the assured could go to keep his indemnity alive by its own terms, and the only person therefore by whose acts the company could be affected by the receipt of the payments, his knowledge of facts avoiding the contract necessarily came near to the company as a fact affording a natural presumption. The strong presumption is that he did his duty as an officer standing in such a relation, by whose acts the company might be so deeply affected. He testifies also that during this time he was a manager, and that the secretary of the company was in the same office with him.. He also was a surveyor by his office, and entitled to receive applications for changes, and often attended to the notices and handed them to the secretary for approval. He stood in the attitude of a partially unwilling witness towards the plaintiff. The premiums were paid to him a number of years in succession, and upon at least two occasions he talked with the assured, when paying his premiums, of the necessity of having the transfer made. It is true he spoke of knowing of the dissolution only by report, and seemed to give colour to the fact that he knew nothing of the transfer. But this semblance of fact is clearly disproved by the

[Buckley *v.* Garrett *et al.*]

facts he testifies. A mere dissolution of the partnership which left the real estate where it was, created no forfeiture. He says also, "likely I knew of the transfer from report, knew from him or other source the firm dissolved—perhaps saw it in the paper. Buckley renewed after the firm was dissolved, and I therefore, knowing how the policy stood, advised a transfer." Now the facts show a knowledge very different from mere report. True he may have first learned it by report, but he conversed with Buckley about it, and on the strength of the conversation advised him to have the policy transferred to him. Then his knowledge became a personal authorized communication from Buckley himself—that which was report now became positive knowledge. Then if, "knowing how the policy stood," to use his own expression, he advised a transfer, it was not simply because he knew of a dissolution, for that alone required no transfer. While the partners continued joint owners, neither could exact a transfer from the other. Why then did he advise a transfer? Clearly because he knew something more—he knew that the dissolution was, as the fact is, accompanied by a transfer of Schofield's interest to Buckley. Clearly then there was evidence to be submitted to a jury that the state of this policy was probably known to the company, while their receipt of the premiums for years after the conversations referred to by Thomas, tended to show an acquiescence in the alienation and a waiver of the forfeiture, and, if this was so, a rightful estoppel; for it will never do to say a company can go on for years receiving the fruits of the policy with a full knowledge of the forfeiture, and, when a loss occurs, then turn upon the assured and tell him his policy is void by reason of bygone events known to both parties, and yet repudiated by both. In this view it will be seen that the fact of Thomas having told Buckley in an early stage of the matter, that he should obtain a transfer of the policy, does not take away the injury thus inflicted upon him by a subsequent course of dealing calculated to lull him to rest.

That such waivers and consequent estoppels may exist is not only proved by authority, but is founded in reason. There is no reason why the same principle of natural justice should not be applied to a contract of indemnity by insurance, which affects all other contract relations. It is a matter of good faith. After a policy forfeited by a violation of one of its conditions, the company received and accepted assessments on the premium note. Held to be a waiver: Viall *v.* Genesee Mutual Insurance Company, 19 Barb. 440.

In a case of false warranty as to adjacent buildings, the company with a knowledge of the fact made and received assessments. Held to be an estoppel, citing numerous authorities: Frost *v.* Saratoga Mutual Insurance Company, 5 Denio 154.

[*Buckley v. Garrett et al.*]

A continuance to act under the terms of an expired contract without objection, concludes the party. This related to tolls on a turnpike: Good Intent Stage Company *v.* Hartzell, 10 Harris 277.

Notice of encumbrances necessary as a condition. "Their consent to stand as insurers would be supplied after such notice, if there was no dissent:" per Woodward, J., Brown *v.* Insurance Company, 5 Wright 187.

The secretary was informed of a second insurance, and replied that this would conflict with the terms of the policy. Afterwards further assessments were collected from the assured. Held this was proper evidence for a jury of a waiver: Insurance Company *v.* Stockbower, 2 Casey 199.

A policy for a year with power to continue by payment of premium and endorsement. Premium paid to the same agent who took the risk, and by him endorsed for several years in succession. After the last renewal the company ordered the agent to return the premium and give notice of withdrawal of the policy. This was communicated to the insured, but premium not refunded. Held that the agent was the duly-authorized officer, empowered to bind, and the company liable for the loss. Per Read, J.

On the subject of a waiver of notice of loss and of preliminary proofs, which are a condition of the policy, there are numerous cases: Taylor *v.* Merchants' Insurance Company, 9 How. 390; McMasters *v.* Westchester Insurance Company, 25 Wend. 379; Clark *v.* New England Insurance Company, 6 Cush. 342; Inland Insurance and Deposit Company *v.* Stauffer, 9 Casey 397, per Strong, J.; Commonwealth Insurance Company *v.* Sennett, 5 Wright 162, per Read, J.; Lycoming Insurance Company *v.* Schaffer, 6 Id. 188, per Thompson, J.; Franklin Insurance Company *v.* Updegraff, 7 Id. 350, per Strong, J.

The judgment is reversed, and a *venire de novo* awarded.

STRONG, J., dissented.

THOMPSON, J., was absent at Nisi Prius when this case was argued.